## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACK ZAVILLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-133 |
| | ) | Judge Nora Barry Fischer |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.      INTRODUCTION

Plaintiff, Jack Zavilla, ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security (the "Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1614(a)(3)(A) (the "Act"). This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Nos. 8, 10).  The record has been developed at the administrative level.

This case presents a novel issue regarding whether a prior decision by the Commissioner, finding Plaintiff medically eligible for SSI, has an effect on his later application for benefits for a subsequent period of time.  Plaintiff argues that he is entitled to SSI under the doctrine of *res judicata* or, alternatively, that this matter should be remanded to the Administrative Law Judge ("ALJ") for further consideration of that decision.  The Commissioner maintains that the doctrine of *res judicata* is not applicable to facts of this case and that the decision of the ALJ should be

1

affirmed as it is supported by substantial evidence in the administrative record.  For the following reasons, the Court finds that the doctrine of *res judicata* is not applicable, but that a remand is necessary.  Accordingly, the Commissioner's motion for summary judgment is denied, Plaintiff's motion for summary judgment is granted in part and denied in part, and the decision of the ALJ is vacated and this matter is remanded for further proceedings consistent with this opinion.

## II.    PROCEDURAL HISTORY

On January 14, 1998, Plaintiff protectively filed an application for SSI. (Docket No. 6 at 42) (Docket Nos. 6, 6-2, 6-3, 6-4 hereinafter, "R. at ___").  The Social Security Administration ("SSA") denied the claim initially. (R. at 45).  The claim was also denied on reconsideration and by a decision of an unnamed administrative law judge dated June 24, 1999. (*Id.*).  However, the Appeals Council remanded the case to another ALJ for further development of the administrative record. (R. at 45). (*Id.*).  ALJ Robert Deitch issued an opinion on January 24, 2002, finding that Plaintiff met the medical requirements to receive SSI benefits but noted that Plaintiff was receiving Veterans' Benefits and directed SSA to determine whether this made Plaintiff ineligible for SSI due to excess resources. (R. at 49, 50).  Plaintiff never received SSI benefits because his eligibility was suspended due to excess resources and later terminated after twelve months of suspension.  (R. at 19).

On January 17, 2006, Plaintiff protectively filed another application for SSI.  (R. at 19).  This claim was initially denied on July 26, 2006 because Plaintiff did not provide the requested information regarding his medical, educational, and work history and failed to attend consultative examinations scheduled for him by SSA without providing any reason for his absences. (R. at 57, 87, 90, 101).

Plaintiff then appealed the denial of benefits.  A hearing was held before ALJ Lamar Davis

on December 11, 2007, in Seven Fields, PA. (R. at 16).  ALJ Davis issued an unfavorable decision on February 6, 2008. (R. at 571).  On December 17, 2008, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's December 11, 2007 decision the final decision of the Commissioner. (R. at 4).

Plaintiff filed a Complaint regarding the denial of his 2006 claim in this Court on February 4, 2009.  (Docket No. 3).  The Commissioner filed an Answer on April 9, 2009.  (Docket No. 5). Plaintiff filed a Motion for Summary Judgment on May 1, 2009.  (Docket No. 8).  In turn, the Commissioner filed a Motion for Summary Judgment on June 1, 2009. (Docket No. 10). Subsequently, the Court ordered the parties to file supplemental briefs regarding the recent decision of *Diaz v. Commissioner of Social Sec.*, 577 F.3d 500 (3d Cir. 2009), as well as the authority cited therein, *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005).  Plaintiff filed his supplemental brief on September 1, 2009 (Docket No. 14), and the Commissioner filed his supplemental brief on September 8, 2009 (Docket No. 15).  Accordingly, this matter is now fully briefed and ripe for disposition.

## III.   STANDARD OF REVIEW

When reviewing a decision denying SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact.  *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).  Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Additionally, a district court cannot conduct a *de novo* review of the Commissioner's determination, nor re-weigh the evidence of record.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir.

1999). Rather, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.   In determining whether a finding is supported by substantial evidence, the district court must review the record as a whole. *See* 5 U.S.C. § 706; *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 431 (3d Cir. 1999). A district court, however, "will not set the Commissioner's decision aside if it is supported by substantial evidence, even if [the district court] would have decided the factual inquiry differently" based on the evidence of record. *Hartranft*, 181 F.3d at 360.

Under the Act an individual is considered "disabled" when he or she is:

> [unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ...

42 U.S.C. §§ 416(i)(1)(A); 423(d)(1)(A); 20 C.F.R. § 404.1505. A person is "unable to engage in substantial gainful activity" when he:

> is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The SSA, acting pursuant to its rule making authority under 42 U.S.C. § 405(a), has promulgated a five-step sequential evaluation process to determine whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the

4

SSA will not review the claim further.  At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [42 U.S.C.] § . . . 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." . . . § 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies . . . . § 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-5 (2003)(footnotes omitted).

## IV.     FACTS

### A.     2002 Favorable Decision by ALJ Deitch on Plaintiff's 1998 Application[1]

Plaintiff was issued a favorable decision on his 1998 application for SSI benefits on January 24, 2002. (R. at 45-50).  ALJ Deitch concluded that Plaintiff had been under a disability, as defined in the Act, since the date of his application, January 14, 1998. (R. at 45, 49).

In his application of the five-step sequential evaluation process to determine disability, ALJ Deitch made the following determinations: (1) Plaintiff had not engaged in substantial gainful activity since January 14, 1998 (R. at 46); Plaintiff had several "severe" impairments, including:

---

[1]     The record demonstrates that Plaintiff's counsel submitted the 2002 decision to ALJ Davis for consideration in this matter under a cover letter dated December 13, 2007.  (R. at 43-50).  It is also noted in the record that the SSA's folder associated with the earlier claim was "destroyed." (R. at 99).

degenerative disc disease of the lumbar spine, residuals of a medial meniscectomy, an absent ACL

of the left knee, a major depressive disorder, and a personality disorder (R. at 46); and, (3) Plaintiff

did not have an impairment or combination of impairments that met or medically equaled one of the

listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. at 48).  The ALJ concluded that

Plaintiff had the following residual functional capacity ("RFC"):

> The claimant's impairments prevent him from performing work requiring lifting or carrying more than 10 pounds frequently or 20 pounds occasionally, more than occasional balancing, stooping, kneeling, crouching, climbing, crawling, pushing/pulling with the lower extremities or climbing of stairs and ramps, any climbing of ladders, exposure to unprotected heights, hazardous moving equipment or extreme cold, interaction with the general public, more than minimal interaction with co-workers or peers, or carrying out and remembering more than very short, simple and routine job instructions.  The claimant's impairments also require that the claimant be provided with an opportunity to alternate between periods of sitting and standing at intervals not exceeding one hour.

(R. at 49). The ALJ also found that Plaintiff could not return to his past relevant work and that

transferability of job skills was not material. (R. at 49).  Finally, the ALJ concluded that based upon

Plaintiff's RFC and the vocational factors, there were no jobs existing in the national economy in

significant numbers that Plaintiff could perform, hence, Plaintiff was disabled under the Act as of

January 14, 1998.  (R. at 49).

**B.      Plaintiff's 2006 Application for SSI Benefits**

1.      *General Background*

Plaintiff was born September 19, 1956. (R. at 28).  Because Plaintiff was forty-nine (49)

years old on the date he filed his 2006 application for SSI benefits, for decisional purposes, he was

considered a "younger individual," creating a rebuttable presumption that Plaintiff would not have

age-related difficulties adjusting to other work. (*Id.*); 20 C.F.R. § 416.963(c).  However, ALJ Davis

noted that Plaintiff, being 51 at the time of the hearing, was "closely approaching advanced age,"

which may indicate that Plaintiff is less able to adjust to other work. (R. at 28); *see* 20 C.F.R. §

416.963(d).  Plaintiff is a high school graduate who did not participate in any special education

classes, special job training, or trade or vocational school. (R. at 46, 91). He lives with his wife and

son.  (R. at 25, 74).  When he applied, he had been working as seasonal help at the Post Office and

said that he could not continue due to disability.  (R. at 82).

2.   *Medical Background*

Plaintiff's application alleges the following injuries, illnesses or conditions which limit his

ability to work: injuries to his lower back and left knee as well as conditions of depression and

anxiety.  (R. at 82, 92).   Upon receipt of Plaintiff's application, the SSA sought additional

information regarding Plaintiff's ailments by scheduling him for consultative evaluations regarding

both his physical and mental health. (R. at 110, 112-13).  In fact, he was reminded to go to the exam.

(R. at 119).  However, Plaintiff failed to attend the evaluations, scheduled for June 12, 2006, and

June 21, 2006, without giving an explanation. (R. at 57, 109, 111).  Plaintiff's application was

initially denied for this reason. (R. at 59).

As a result, the record before ALJ Davis consisted of the following: (1) medical records

covering the period from 3/27/95 to 9/26/05 from the Veterans Affairs Medical Center ("VAMC")

in Butler; (2) progress notes covering the period from 3/27/95 to 12/7/05 by Dr. Ed Balestrino, a

doctor of osteopathic medicine; (3) treatment records covering the period from 8/20/96 to 3/24/06

by Dr. Dennis R. Corbett, a chiropractor; (4) a psychiatric review technique form dated 6/23/06; (5)

a medical statement dated 11/21/07 by Dr. Balestrino; and (6) medical records covering the period

7

from 5/1/06 to 1/5/07 from Butler VAMC.[2]  (R. at 2, 3).

a.     Back Condition

With respect to Plaintiff's lower back condition, the record contains the following.  Plaintiff began having non-radiating back pain in the 1970s. (R. at 247).  On at least three occasions in the summer and fall of 1989, Plaintiff felt his back crack while trying to move a pallet on the floor at work. (R. at 68).  He claims he has not been able to work since November 1, 1989. (*Id.*).

Plaintiff began seeing chiropractor Dr. Dennis R. Corbett on November 1, 1989. (R. at 70). At that time, Plaintiff complained of bilateral low back pain that was more intense on the right side and radiating into his buttocks, thigh, and calf. (*Id.*).  Dr. Corbett diagnosed Plaintiff with a lumbosacral strain.[3]  (*Id.*).  After six months of treatment, Dr. Corbett stated that Plaintiff's lumbosacral strain was "pretty much resolved," but that the initial injury had led to lumbar facet syndrome and myofacial syndrome[4] and that the bulging and narrowing of the disc seen on an initial MRI would likely continue. (*Id.*).

Dr. Corbett also referred Plaintiff to Dr. Francis T. Ferraro, who is board-certified in neurological surgery. (R. at 69).  Dr. Ferraro examined Plaintiff twice in late 1989. (*Id.*).  He

---

[2]

As recognized above, the 2002 decision of ALJ Deitch was also part of the administrative record, however, ALJ Davis made no findings regarding the 2002 decision.

[3]

A "lumbosacral strain" is "[a]n abnormal condition involving the joint between the fifth lumbar vertebrae and the sacrum resulting from excessive use and forcible stretching of the muscles of the lower part of the back.  It is accompanied by pain on motion, muscle spasm, tenderness, and, occasionally, swelling." ATTORNEY'S DICTIONARY OF MEDICINE ILLUSTRATED at L-197 (Vol. 3 1998).

[4]

Myofacial syndrome consists of "[i]rritation of the muscles and fasciae (membranes) of the back and neck causing chronic pain (without evidence of nerve or muscle disease)."  ATTORNEY'S DICTIONARY OF MEDICINE ILLUSTRATED  at at M-339.

8

confirmed the diagnosis of lumbosacral strain, noted that Plaintiff's only objective neurological abnormality was a diminished right knee jerk reflex, and recommended 2-3 weeks of physical therapy. (R. at 69-70). Dr. Ferraro opined that Plaintiff would be able to return to work within two months. (R. at 69).

An MRI of Plaintiff's back performed on November 7, 1989 indicated a small central bulge at L5/S1, which did not appear to impinge on the nerve root on either the right or the left, according to the analysis of Dr. G. Malcolm Cottington, a board-certified orthopedic surgeon. (R. at 69). After examining Plaintiff on April 9, 1991, Dr. Cottington reported that the findings from the November 7, 1989 MRI were insignificant, given the lack of accompanying clinical findings. (*Id.*). He opined that any lumbosacral strain had resolved and that Plaintiff would not need further medical or chiropractic treatment for said condition. (*Id.*). Dr. Cottington also believed that Plaintiff could return to medium duty at that time and progress to his regular duties, which Dr. Cottington classified as heavy. (*Id.*).

More recent records demonstrate the following. MRIs taken of Plaintiff's lumbosacral spine in 2000 reviewed by Dr. Theodore Witford, showed minimal facet hypertrophy[5] and sclerosis at L5/S1. (R. at 352). On May 30, 2002, Dr. Ashok Adalja noted that Plaintiff was in mild distress due to back pain and arthritis. (R. at 214). An MRI taken on March 17, 2003, reviewed by Dr. David Ravella, showed degenerative disc disease at L2-L3 in an otherwise normal appearing lumbosacral spine. (R. at 348). Plaintiff complained of chronic back and leg pain to treatment providers on September 26, 2005. (R. at 344). However, Dr. Ravella noted that an x-ray of his cervical spine

---

[5]

Hypertrophy refers to a "[g]eneral increase in bulk of a part or organ not due to tumor formation." STEDMAN'S MEDICAL DICTIONARY at 929 (28th ed. 2006).

taken on that date was normal.  (*Id.*).  On May 1, 2006, Plaintiff reported to Dr. Adalja that his back "bothered him" while driving.  (R. at 548).

Dr. Corbett continued to treat Plaintiff from the 1989 injury through at least March 24, 2006. (R. at 165, 478). At Dr. Corbett's request, between November 28, 2005 and March 24, 2006, Plaintiff completed a number of subjective questionnaires regarding the effect of his back pain on his ability to function in performing normal activities of daily living. (R. at 478, 483, 487, 499-503).  Results from these tests indicate that Plaintiff suffered from a "crippling disability" or that he was "bed bound or exaggerating disability." (*Id.*). However, notes from exams conducted by Dr. Corbett on November 25, 2006 indicate that Plaintiff "could walk toe to heel without assistance;" walk on his heels and toes without difficulty; stand on his right and left legs without difficulty; and, that he was able to "run his right heel down his left shin in a smooth motion" and "run his left heel down his right shin in a smooth motion." (R. at 493, 495).  Over that period, Plaintiff characterized the pain he was experiencing in his upper, middle and lower back in the following manner: (1) as "moderate" on November 30, December 20 and December 27, 2005 and January 25, 2006 (R. at 488-91); (2) as "moderate to severe" on January 30, 2006 (R. at 485); and, (3) as "severe" on February 13, 17 and March 1, 2006 (R. at 481-83). Plaintiff also reported at each of these visits that his symptoms subsided at least temporarily after he received treatment from Dr. Corbett.  (R. at 481-91).

On February 17, 2006, Dr. Corbett completed an "Employment Assessment Form" issued by the Department of Public Welfare on Plaintiff's behalf.  (R. at 480).  Dr. Corbett indicated on the form that Plaintiff was permanently disabled, and specifically that he "[h]as a physical or mental condition which precludes any gainful employment."  (*Id.*).

Thereafter, a functional screening performed at the VAMC on January 4, 2007 revealed that

Plaintiff was able to perform activities of daily living without assistance.  (R. at 542).  Dr. Sarita

Golikeri, M.D., also noted on that date that Plaintiff's back pain was stable.  (*Id*.).

On November 21, 2007, Dr. Balestrino responded to an inquiry from Plaintiff's attorney

regarding his application for SSI benefits.  (R. at 536).  Dr. Balestrino stated that Plaintiff had been

his patient for ten years and he generally visited with complaints of hypertension or acute illnesses.

(*Id*.).  He explained that he had never determined that Plaintiff was disabled as a result of chronic

back pain but that Plaintiff typically visited the VAMC for issues related to his back.  (*Id*.).

### b.     Knee and Foot Ailments

The record contains the following with respect to Plaintiff's knee and foot ailments.  Plaintiff

injured his left knee in 1975 while in the Navy. (R. at 46, 241).  Later surgery revealed that he does

not have an anterior cruciate ligament ("ACL") or a medial meniscus in that knee. (R. at 46, 185).

Plaintiff has worn a brace on his left knee when walking long distances or over uneven surfaces since

1996.

On March 2, 2003, Plaintiff slipped on ice and further injured his left knee. (R. at 131).  An

x-ray showed moderate suprapatellar effusion[6] and mild degenerative joint disease.[7] (R. at 132).

Four days later, Plaintiff was given an injection of lidocaine (local anesthetic) and Depo-Medrol

(anti-inflammatory) by Dr. Timothy McNulty.  (*Id.*).  Plaintiff refused formal physical therapy,

electing instead to pursue a home exercise program, though Dr. McNulty noted Plaintiff's history

---

[6]

　　　　Suprapatellar effusion refers to excess fluid over the kneecap.  *See* STEDMAN'S MEDICAL DICTIONARY at 616,
1441 (28th ed. 2006).

[7]

　　　　Degenerative joint disease is also known as osteoarthritis.  STEDMAN'S MEDICAL DICTIONARY at 1388 (28th ed.
2006); Attorney's Dictionary of Medicine at D-39.

of noncompliance with such arrangements. (R. at 132, 198, 350). Dr. McNulty also directed Plaintiff to "ween his crutches over the next week." (R. at 132). At a follow-up appointment on May 9, 2003, Plaintiff stated that his left knee felt better than it had before the slipping incident. (R. at 180). However, he also reported chronic pain in his right knee which Dr. McNulty diagnosed was possibly caused by early arthritis, minor medial instability or a minor tear of the medial meniscus. (R. at 180). Plaintiff declined therapy but was issued a brace for use on his right knee as well as arch orthotics. (R. at 128, 180).

On June 22, 2004, Plaintiff reported pain in his left foot, knee and shoulder as well as his right hip. (R. at 155). He complained that the shoe inserts previously prescribed did not help his chronic knee pain and stated that his chiropractor recommended that he be prescribed custom orthotics instead. (R. at 155). He was referred to podiatry. (*Id.*) After a consult with a podiatrist in July of 2004, Plaintiff was diagnosed with plantar fasciitis.[8] (R. at 122).

Thereafter, on March 23, 2005, Plaintiff saw Dr. Balestrino because he felt a tear in his left knee when he was removing his pants and had some swelling. (R. at 457). Dr. Balestrino noted that Plaintiff's "knee looks grossly normal" on exam, diagnosed Plaintiff with bursitis and "a possible tear of previous adhesions from surgery." (*Id.*). Plaintiff was given an injection of Kenalog (anti-inflammatory) and Marcaine (local anesthetic). (*Id.*). Plaintiff was advised to return if the injection did not help. (*Id.*).

Subsequently, on September 26, 2005, Plaintiff fell and sought treatment at the VAMC for chronic back and leg pain. (R. at 142-43). The records state that Plaintiff was at risk for falls at that

---

[8]

Plantar fasciitis is inflammation of the band of connective tissue that runs across the bottom of the foot, connecting the heel bone to the toes. STEDMAN'S MEDICAL DICTIONARY 700, 706 (28th ed. 2006); *see also Radke v. Taco Bell Corp.*, 64 Fed.Appx. 542, n.1 (7th Cir. 2003)(not precedential)(same).

time due to his history of falls and his use of a cane/walker to ambulate. (R. at 145).  He was also

counseled on fall prevention.  (*Id.*).  In July of 2006, Plaintiff sought treatment at the VAMC for a

fracture to his great toe on his left foot, reporting that he was injured after his ACL "gave out" and

he fell. (R. at 544-46, 568).  Further, at a January 4, 2007 visit, a nurse noted that Plaintiff continued

to use a cane to ambulate and remained at risk for falls due to his history of falls and an unsteady

gait.  (R. at 563).  Plaintiff was again provided with fall prevention education at that time.  (*Id.*).

c.    Mental Impairments

The record contains the following with respect to Plaintiff's mental impairments.  Plaintiff

reported anger issues in 1999, 2000 and 2001, mostly as a result of being denied benefits from

several government entities.[9] (R. at 241, 252, 300, 314-15).  Plaintiff commented during a psychiatric

consult at the VAMC on October 18, 2000 that this wife describes him as "like Dr. Jekyll and Mr.

Hyde" and that she believes "he doesn't even realize when he becomes enraged." (R. at 277).  He

was referred to counseling for his anger.  (*Id.*).  On March 13, 2001, Plaintiff stated that he avoids

his children because he fears he will harm them in anger. (R. at 241).  At that time, it was noted that

he failed to refill his Elavil (antidepressant) prescription regularly and he was started on Depakote[10]

to manage his anger.  (R. at 240, 242).  On April 23, 2001, Plaintiff reported that he had stopped

---

[9]

The Court notes that Plaintiff's application for benefits at issue in this action demonstrates similar anger toward the Government.  In Section 9, "Remarks" of his application, Plaintiff states that:

> I could write a book on the lies[,] deception and manipulation of paperwork by the V.A.  The social security system isn't far behind them.  I am glad the ice caps are melting, we deserve this for allowing our government to exist at its present state.  Our government's moto [sic] "Eliminate Liability."

(R. at 90).

[10]

Depakote is used to treat certain psychiatric conditions involving hostility and aggression as well as bipolar disorder. PHYSICIAN'S DESK REFERENCE 429-30 (61st ed. 2007).

13

taking Depakote because "other doctors told him to stay away from it." (R. at 233).  He stated that

he was taking Amitriptyline (antidepressant).  Six months later, however, Plaintiff reported that he

wanted to cut his dosage of Amitriptyline in half so that he could feel more alert. (R. at 221).

With regard to his symptoms of depression, a nurse at the VAMC reported on April 23, 2001

that Plaintiff's depression was in partial remission, but his anger issues remained. (R. at 233).

However, his negative outlook on life was again evident on October 31, 2001 and he exhibited

symptoms of depression. (R. at 220).  Then, on February 18, 2003, Plaintiff reported that he was no

longer taking antidepressant medication but expressed some anger with respect to an ongoing legal

dispute between him and a neighbor.  (R. at 196).  He declined any further mental health treatment.

(*Id*.).  He also denied any symptoms of depression or insomnia on August 14, 2003, March 22, 2004,

and January 13, 2005.  (R. at 141, 159-60, 149-50).

Dr. Balestrino examined Plaintiff on December 7, 2005, at the request of a psychologist who

had been treating him for depression.  (R. at 456).  His notes indicate that Plaintiff was extremely

irritable and that his energy level was low such that "[h]e typically likes to hunt and did not even buy

a license this year." (*Id*.).  Dr. Balestrino prescribed Effexor for depression and recommended

continued counseling.  (*Id*.).

VAMC records from May 1, 2006, note that Plaintiff had positive signs for depression and

that he was being treated for post-traumatic stress disorder.  (R. at 549, 558).  He was referred to the

mental health department but declined treatment.  (R. at 550). However, a depression screen taken

by a nurse on that date was negative.  (R. at 550).

On June 23, 2006, a Psychiatric Review Technique form was completed by Dr. Manella

Mink, Ph.D.  (R. at 523-35).  He determined that there was insufficient evidence to make any

determination regarding Plaintiff's alleged mental impairments because Plaintiff failed to attend the scheduled consultative examination.  (R. at 529, 533, 535).

Subsequently, on January 4, 2007, Dr. Golikeri noted Plaintiff's history of depression and that Plaintiff was "very agitated about recent legal events." (R. at 540).  As a result, it was recommended that Plaintiff seek a mental health consult, but he refused.  (*Id*.).  Plaintiff also denied any suicidal or homicidal ideation.  (*Id*.).

> d.   Other Health Conditions

A 2004 hearing evaluation revealed that Plaintiff has significant hearing loss.  (R. at 126). A hearing aid was provided by the VAMC and Plaintiff was trained on the use and maintenance of the device. (R. at 126, 153).  Plaintiff declined a follow-up appointment and it is unknown whether this intervention was effective. (R. at 153).

Plaintiff also has a history of tobacco use, (1 pack of cigarettes per day for over 20 years), alcohol abuse, weight management problems, hypertension, and he wears bifocals due to eyesight limitations.  (R. at 134-135, 199, 261, 393).  As of January 5, 2007, Plaintiff was prescribed the following medications: albuterol,[11] cyclobenzaprine (muscle relaxant), fosinapril (for blood pressure), gemfibrozil (to lower cholesterol),[12] hydrochlorothiazine (diuretic), moxifloxacin (antibiotic), nicotine patches, propoxyphene (pain reliever), and venlafaxine (antidepressant). (R. at

---

[11]

"Albuterol is a bronchodilator used to treat asthma."  *Snyder ex rel. Snyder v. Secretary of Dept. of Health and Human Serv.*, 2009 WL 332044, n.426 (Fed.Cl. Feb. 12, 2009)(citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 45).

[12]

"Gemfibrozil is 'a cholesterol-lowering medicine used to lower the rates of heart disease and heart attacks. It is used along with diet control, exercise, and other measures.'" *Vernon v. Astrue*, Civ. A. No. 06-13132(RMB)(DF), 2008 WL 5170392, 4 (S.D.N.Y. Dec. 9, 2008)(citing 3-G ATTORNEYS' DICTIONARY OF MEDICINE 1061).

537).

### 3.    *December 11, 2007 Hearing Before ALJ Davis*

A hearing regarding Plaintiff's 2006 application was held on December 11, 2007, in Mars, Pennsylvania, before ALJ Lamar Davis. (R. at 31, 34).  At the hearing, Plaintiff appeared with the assistance of counsel, Joanna P. Papazekos, Esquire. (R. at 19).

Plaintiff testified that he has not worked since 1989 and that he had four severely bulged discs in his back. (R. at 573).  He explained that he had been advised by doctors that he was not a surgical candidate because they feared surgery would trigger a domino effect that would lead to him needing a wheelchair.  (*Id.*).  He testified that he had been told by doctors that his muscles were chemically imbalanced. (*Id.*).  He further stated that he is prescribed pain killers and muscle relaxers for his back condition and receives treatment by his chiropractor, Dr. Corbett.  (R. at 577-78).

He explained that he is limited in performing household chores and cannot participate in hobbies, such as hunting. (*Id.* at 576).   He must use a cane while walking under certain circumstances, *i.e.*, on steps, when walking distances over 200 feet, in poor weather conditions and in unfamiliar environments.  (*Id.* at 576, 577, 579-580).  He testified that he needs to lay down after four hours of activity.  (*Id.* at 580).  He explained that his body is uncomfortable most of the time.  (R. at 581). He is also often embarrassed because his physical limitations make him unreliable to others.  (*Id.*).  With regard to his mental health conditions, Plaintiff testified that he has trouble relating to people.  (*Id.*).  He explained that he is not uncomfortable having contact with people and that his embarrassment over his irritability is "life." (R. at 580).

16

Samuel E. Edelmann, M.Ed.,[13] an impartial vocational expert, also testified. (R. at 19). ALJ Davis asked Edelmann whether jobs existed in the national economy for a hypothetical individual with the Plaintiff's age, education, work experience, and who:

> is capable of no more than light exertional activity; and limited in terms of postural adaptation, which is stoop, kneel, crouch, crawl, balance, and climb ladders, ropes, and scaffolds to no more than rarely, or as I like to say, incidentally. Which, to quantify, would be totaling up to but not exceeding one-sixth of a routine eight-hour workday at times here. Postural adaptations, no more than incidentally, with no exposure to hazards such as unprotected heights and dangerous machinery; or environmental factors such as temperature extremes which I would define as less than 40 degrees Fahrenheit on a continuous basis, and excessive humidity. And finally, the hypothetical individual is afforded a discretionary sit/stand option while being relegated to simple, routine, repetitive tasks involving no piece work production rate pace.

(R. at 582-83). Edelmann identified several such jobs: cashier, telephone order clerk, surveillance system monitor, ticket sales, and some handpackaging. (R. at 583, 585). ALJ Davis then asked the vocational expert to consider:

> in addition to the foregoing array of limitations, that the hypothetical individual requires accommodation for unscheduled work breaks throughout the course of a day averaging 15 to 20 minutes per hour, and totaling four times in the course of that eight hour day.

(*Id.*). With regard to this second hypothetical, Edelmann opined that no jobs exist in the national economy that such a person could perform. (R. at 584). ALJ Davis also asked Edelmann to consider

---

[13]

Plaintiff stipulated to Mr. Edelmann's professional qualifications at the 2007 hearing. (R. at 572). Edelmann's C.V. states that he attained a Bachelor of Arts in political science and psychology from Ohio University, Athens, Ohio, in 1971 and that he was awarded a Masters of Education in Rehabilitation Counseling in January, 1973 from the University of Pittsburgh. (R. at 39). He was also certified as a Fellow by the American Board of Vocational Experts in 1985. (R. at 40). He is currently in private practice of vocational rehabilitation counseling and consultation including performing as an expert witness to the Bureau of Hearings and Appeals, Social Security Administration, and the United States Railroad Retirement Board. (R. at 39).

the jobs available to a person if:

> in addition to the limitations in hypothetical number one . . . a hypothetical individual required accommodation for inattention and distraction caused by intermittent symptoms adversely impacting both precision and pace, and resulting in a 15 to 20 percent downward departure from established standards in workplace productivity.

(*Id.*).  Edelmann responded that there would not be jobs available to such an individual in the national economy. (*Id.*).  Edlemann explained that the jobs he cited were at the light exertional level. (*Id*. at 585).  He further testified that an individual had to have the ability to be on his feet for a period of four hours to be considered able to perform light work.  (*Id*. at 586). He stated that if an individual was able to be on his feet for only 3 hours and 59 minutes it would preclude a finding that such individual was able to perform light work.  (*Id*.).

During the hearing, Plaintiff's counsel asserted that the 2002 decision finding Plaintiff medically eligible for SSI had a legal impact on the decision in the current case. (R. at 586).  ALJ Davis asked for a brief on the issue with citations to appropriate authority and Plaintiff's counsel agreed to provide same within fifteen days. (R. at 588). No such brief was provided to ALJ Davis before he issued his decision, but Plaintiff's counsel did later submit the brief to the Appeals Council, which made it a part of the record. (R. at 7, 9-15, 19).  However, as previously noted, the 2002 decision was provided by Plaintiff's counsel to ALJ Davis under a cover letter dated December 13, 2007.  (R. at 43-50).

4.    *ALJ Davis' 2008 Decision*

ALJ Davis issued his opinion on February 6, 2008.  (R. at 19).  He noted the 2002 favorable decision but made no findings regarding that decision.  (R. at 19).  Then, after considering the

18

medical evidence of record and testimony from the hearing, concluded that Plaintiff's medically determinable impairments did not meet the requirement for receipt of SSI benefits and that Plaintiff retained the ability to perform work that existed in significant numbers in the national economy. (R. at 22, 26).  Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, since the date his application was filed, January 17, 2006. (R. at 29).

In his decision, the ALJ made the following determinations: (1) Plaintiff had not engaged in substantial gainful activity since January 17, 2006 (R. at 21); (2) Plaintiff had the following "severe" impairments: degenerative disc disease, degenerative joint disease of the left knee, and a mood disorder, and that Plaintiff had received medical treatment for other conditions, but the medical records in evidence did not show them to be disabling (R. at 21-22); and, (3) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22).  With regard to Plaintiff's back and left knee complaints, the ALJ found that "the VAMC record shows minimal objective findings but the medical evidence of record does not show listing level severity." (*Id.* (citing Exhibit B-6F)). Regarding Plaintiff's mental impairments, the ALJ determined that "the claimant's depressive symptoms are severe within the meaning of the Regulations but not severe enough to meet or medically equal the listing." (R. at 25).

At step four, the ALJ concluded that Plaintiff had:

> the residual functional capacity to perform unskilled light work with a discretionary sit/stand option while doing no more than simple, routine, repetitive tasks, with no postural changes, such as crawling, kneeling, climbing, or balancing, for not more than one-sixth of a routine eight-hour work shift; with no exposure to hazards, such as unprotected heights and dangerous machinery; and no exposure to

> environmental factors such as temperature extremes (less than 40
> degrees F.) and humidity and requiring no piece work production rate
> pace.

(R. at 26).  The ALJ also found that Plaintiff had no past relevant work and concluded that transferability of job skills was not an issue. (R. at 28).

At step five, he concluded that "[c]onsidering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. at 28 (citing 20 C.F.R. §§ 416.960(c), 416.966)).

The ALJ held that, though Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (R. at 28). Specifically, after considering the evidence of record, the ALJ found that Plaintiff's testimony regarding why he could not work was not credible, explaining that Plaintiff "is able to care for his personal needs and is reasonably able to function to the degree that he can perform unskilled light work." (R. at 25-26).  The ALJ also noted that Plaintiff's chiropractor, Dr. Corbett, was the only person to offer an opinion as to whether Plaintiff was able to work.  (R. at 27). The ALJ did not accept Dr. Corbett's opinion that Plaintiff was permanently disabled and unable to work because Dr. Corbett's findings were both internally inconsistent and inconsistent with the remainder of the record as well as based on the Department of Welfare's standard of disability. (*Id.*).  Finally, the ALJ reiterated that Plaintiff did not attend either of the consultative evaluations that were scheduled for him. (R. at 28).

**VI.     DISCUSSION**

Plaintiff argues that the ALJ erred by finding that he was capable of performing light work and was not disabled in the current proceeding because such finding is contrary to the 2002 decision which found him to be capable of performing only sedentary work and that he was disabled. (Docket No. 9).  He contends that the doctrine of *res judicata* is applicable and that the 2002 finding of disability is binding on the Commissioner, absent evidence of improvement in his conditions.  (*Id*.). He also maintains that the current record demonstrates that his impairments have worsened over time.  (*Id*)  Alternatively, Plaintiff argues that the matter should be remanded because the ALJ failed to address how Plaintiff is currently capable of light work while the ALJ in the 2002 decision found that Plaintiff was capable of only less than sedentary work.  (*Id*.).

In response, the Commissioner argues that *res judicata* is not applicable and that the 2002 decision does not bind the current ALJ to find that Plaintiff is disabled under the Act during the current period.  (Docket No. 11).  The Commissioner maintains that the ALJ properly considered the evidence from the current period and determined that Plaintiff had the residual functional capacity to perform a limited range of light work and that these findings are supported by substantial evidence.  (*Id*.).  Therefore, the Commissioner requests that his motion for summary judgment be granted and that Plaintiff's motion requesting benefits or a remand be denied.  (*Id*.).

The Court will address the parties' respective arguments, in turn.

A.     *The Doctrine of Res Judicata Did Not Bind the ALJ in the 2008 Decision to the Findings of the ALJ in the 2002 Decision*

The United States Court of Appeals for the Third Circuit has recognized that "[*r*]*es judicata* principles apply to administrative as well as judicial adjudications." *Tobak v. Abfel*, 195 F.3d 183,

186 (3d Cir. 1999)(citing *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 421-22 (1966)).

If applicable, *res judicata* can be invoked by the Commissioner pursuant to 42 U.S.C. § 405(h)[14] and

20 C.F.R. § 404.957(c)(1)[15] in order to prevent a claimant from filing successive applications for

Social Security benefits.  *See Rucker v. Chater*, 92 F.3d 492, 494 (7th Cir. 1996)("section 405(h) and

other regulatory provisions embody the fundamental and familiar principles of *res judicata*."). In this

context, the Court of Appeals has recognized that "*res judicata* may only be properly applied to

preclude a subsequent claim for disability benefits where the 'same' claimant has filed a previous

application based on the 'same' issues and where such prior determination has become final by virtue

of administrative or judicial action." *Tobak*, 195 F.3d at 186 (citing 20 C.F.R. § 404.957(c)(1);

---

[14]

Section 405(h) provides, in pertinent part, that:

> [t]he findings and decisions of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided.

42 U.S.C. § 405(h).

[15]

Section 404.957(c)(1) provides that:

> An administrative law judge may dismiss a request for a hearing under any of the following conditions:
>
> ...
>
> (c) The administrative law judge decides that there is cause to dismiss a hearing request entirely or to refuse to consider any one or more of the issues because--
>
> (1) The doctrine of res judicata applies in that we have made a previous determination or decision under this subpart about your rights on the same facts and on the same issue or issues, and this previous determination or decision has become final by either administrative or judicial action.

20 C.F.R. § 404.957(c)(1).

*Purter v. Heckler*, 771 F.2d 682, 691 (3d Cir.1985)).

Plaintiff maintains that the doctrine of *res judicata* is applicable to bind the Commissioner as to the findings of the earlier ALJ set forth in the 2002 decision.  (Docket No. 9).  Plaintiff contends that the earlier findings and decision are binding on the Commissioner even though the current ALJ's decision is based on a time period subsequent to that addressed in the earlier decision. (*Id*.).  In support of his argument, Plaintiff relies on *Lively v. Secretary of Health and Human Services*, 820 F.2d 1391 (4th Cir. 1987), and *Drummond v. Comm. of Soc. Sec.*, 126 F.3d 837, 841 (6th Cir. 1987), decisions from outside the Third Circuit which generally stand for the proposition that a claimant may invoke the doctrine of *res judicata* against the Commissioner and bind a subsequent ALJ to the findings and decision of an earlier ALJ.

The United States Court of Appeals for the Third Circuit has not issued a precedential opinion addressing this issue, although the Court of Appeals has issued two not precedential decisions which have held that earlier findings and decisions of an ALJ are not binding in later proceedings which involve a determination of whether a claimant is disabled for a subsequent period. Specifically, in *Carter v. Barnhart*, the Court of Appeals found that:

> [t]he affirmative defense of *res judicata* did not bind [the ALJ in the second decision] because the record contained new evidence that was unavailable to [the first ALJ], and because the relief sought was limited to a determination that he was disabled from July 1999, instead of May 1995 as alleged in the earlier application.

*Carter v. Barnhart*, 133 Fed. Appx. 33, 35 (3d. Cir. 2005)(not precedential).  Also, the Court of Appeals held in *Clark v Barnhart*, that "findings by the previous ALJ that [the claimant] was disabled under the Act in 1996 does not prove that [the claimant] has an impairment that prevented

him from engaging in any substantial gainful activity which lasted for twelve months prior to October 2002." *Clark v Barnhart*, 206 Fed. Appx. 211, 214-15 (3d Cir. 2006)(not precedential). District courts within the Third Circuit have reached similar conclusions.  In *McGill v. Barnhart*, the district court held that "*res judicata* does not apply when two distinct periods of time are at issue," rejecting a plaintiff's argument that the findings in a 1998 decision should have bound the ALJ in a 2000 decision.  *McGill v. Barnhart*, Civ. A. No. 01-5257, 2003 U.S. Dist. LEXIS 7671, at *18-19 (E.D. Pa. Apr. 22, 2003).  Likewise, in *McAllister v. Chater*, the district court found that a finding of an ALJ in 1985 that a claimant was limited to sedentary work did not bind an ALJ in a 1994 adjudication. *McAllister v. Chater*, Civ. A. No. 93-217-SLR, 1997 U.S.Dist.LEXIS 4183, at *31-35 (D.Del. 1997).  Other Courts of Appeals have reasoned similarly.  *See e.g., Rucker v. Chater*, 92 F.3d 492 (7th Cir. 1996)(distinguishing *Lively* and holding that collateral estoppel did not bind a subsequent ALJ to earlier findings when the two decisions were separated by four years); *Albright v. Comm. of the SSA*, 174 F.3d 473 (4th Cir. 1999)(same; discussed in detail below).  The Court is persuaded by these decisions and holds that the doctrine of *res judicata* does not bind a subsequent ALJ to findings and decisions of an earlier ALJ when a claimant seeks benefits during a subsequent period of time.

The Court also finds that the decisions cited by Plaintiff, *Lively* and *Drummond*, are distinguishable and not persuasive.   In *Lively*, the plaintiff was denied benefits because the ALJ found that he was capable of light work and was not disabled under the Act. *Lively*, 820 F.2d at 1391-92.  Two weeks after the decision became final, the plaintiff turned 55 years of age, and filed another application.  *Id.* at 1392. His age qualified him as a person of "advanced age" and a person

in that age category who is found capable of performing only light work is considered disabled under the Act. *Id.* Plaintiff was again denied benefits on his subsequent application, with the ALJ finding him capable of medium work, contrary to the earlier findings. *Id.* On appeal, the United States Court of Appeals for the Fourth Circuit reversed the ALJ's decision, holding that absent evidence of medical improvement in the few weeks that had elapsed between the first denial and the second application, the plaintiff was entitled to benefits. *Id.*

*Lively* certainly suggests that prior findings and decisions of an ALJ are binding in subsequent proceedings, but it is also clearly distinguishable from the instant matter as the time period between the claimant's final unfavorable decision and the subsequent application in *Lively* was only a few weeks, while the difference in this case is four years. In addition, *Lively* has been clarified by a later decision of the United States Court of Appeals for the Fourth Circuit, *Albright v. Comm. of the SSA*, 174 F.3d 473 (4th Cir. 1999). The *Albright* Court held that *Lively* was a "rare case" and explained that it was not decided on *res judicata* grounds, but that the decision was only a "practical illustration of the substantial evidence rule." *Albright*, 174 F.3d at 476-77. In fact, in *Albright*, the Court of Appeals rejected an argument that a period of three years between the claimant's final decision and later application required the earlier findings to be binding under the doctrine of *res judicata* and found the SSA's treatment of later claims as separate from the earlier adjudication to be "eminently logical and reasonable." *Albright*, 174 F.3d at 476.

The decision in *Drummond* is distinguishable on similar bases. *Drummond* is a pre-*Albright* decision of the United States Court of Appeals for the Sixth Circuit which relies on *Lively* as standing for the proposition that "[a]bsent evidence of an improvement in a claimant's condition, a

25

subsequent ALJ is bound by the findings of a previous ALJ." *Drummond*, 126 F.3d at 842. However, the time period between the earlier unfavorable decision and the later application in *Drummond* was two years. As a consequence, *Drummond* represents an extension of the principles in *Lively* which the Fourth Circuit declined to make in *Albright*. While *Drummond* remains good law in the Sixth Circuit, this Court is not bound by the decision nor persuaded by its reasoning.

Finally, the decision in *Pieczynski v. Barnhart* does not support Plaintiff's argument that the current ALJ was bound by the findings of the former ALJ or that he is entitled to benefits in this action. *See Pieczynski v. Barnhart*, 430 F.Supp.2d 503, 510 (W.D.Pa. 2006). In *Pieczynski*, the district court found that the ALJ explicitly stated in his opinion that he found "no basis to reopen or revise" a 1998 decision, thereby giving *res judicata* effect to same, but then made findings contrary to that decision without providing any explanation for his departure from the prior findings. *Pieczynski*, 430 F.Supp.2d at 510. The district court ordered that the matter be remanded for further proceedings to determine if *res judicata* was applicable or if a departure from the earlier findings was warranted based on an improvement in the Plaintiff's medical conditions. *Id*. As that matter involved a remand, it does not support Plaintiff's request for benefits in this case.

Here, Plaintiff's is far different from the "rare case," *Lively*. Instead, his case involves two applications for SSI based on distinct periods of time separated by four years. Therefore, the doctrine of *res judicata* in not applicable to the instant matter because the 2002 favorable decision did not bind the ALJ from determining whether Plaintiff was disabled under the Act as of his application date of January 17, 2006. Accordingly, Plaintiff's motion for summary judgment is denied to the extent that he requests that the decision of the ALJ be vacated and an award of benefits

26

be entered in his favor.  However, as is discussed below, Plaintiff's motion for summary judgment is granted to the extent that he requests that this matter be remanded.

      B.    *The ALJ's Decision is Not Supported by Substantial Evidence Because the ALJ Failed to Make Any Findings Regarding the 2002 Decision*

     While the findings regarding Plaintiff's residual functional capacity in the 2002 decision were not binding in the later proceedings, the ALJ erred by failing to explicitly address those findings and not explaining what weight, if any, was given to the 2002 decision.  As a consequence, the ALJ's decision is not supported by substantial evidence and a remand for further proceedings is necessary to address the prior findings and their applicability, if any, to Plaintiff's current application.

     A claimant's "'[r]esidual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Burnett v. Comm. of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)(quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n. 1 (3d Cir.1999), *which cited* 20 C.F.R. § 404.1545(a)).  In the 2008 decision, the ALJ found that Plaintiff was capable of "light work" without any consideration of the finding in 2002 that he was capable of only "sedentary work."[16]  *See* 20 C.F.R. § 404.1567(a)-(b).  This distinction is important because,

---

[16]

    "Sedentary work" and "light work" are defined at 20 C.F.R. §§ 404.1567(a) and (b) as follows:

        (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

        (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all

given Plaintiff's age, a finding by the ALJ that he was capable of only sedentary work would have made him medically eligible for SSI benefits.

The United States Court of Appeals for the Third Circuit has recognized that "[i]n making a residual functional capacity determination, the ALJ must consider all evidence before him." *Burnett*, 220 F.3d at 121 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir.1986)); *see Fargnoli*, 247 F.3d at 41 (holding that the Commissioner must consider "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others"); *see also* 20 C.F.R. § 404.1520(a)(3)("We will consider all evidence in [the claimant's] case record when we make a determination or decision whether you are disabled."). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Id*. (citing *Plummer*, 186 F.3d at 429; *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Id*. (quoting *Cotter*, 642 F.2d at 705). In sum, "an ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm. of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008)(citing *Cotter*, 642 F.2d at 706-07).

The regulations define evidence as "anything that [the claimant] or anyone else submits to us or that we obtain that relates to [the claimant's] claim" including "[d]ecisions by any governmental

---

of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(a)-(b).

or nongovernmental agency about whether [the claimant is] disabled or blind ..." 20 C.F.R. §
416.912(b)(5).  While decisions of government agencies are not binding on the Commissioner, they
may be entitled to substantial weight and must be considered.  *See Kane v. Heckler*, 776 F.2d 1130
(3d Cir. 1985)("a determination by another government agency is entitled to substantial weight.").
Certainly, a prior decision as to a claimant's disability under the Act by the Commissioner is
evidence under § 416.912(b)(5) and must be considered by the ALJ when evaluating a claim for
benefits.  The ALJ made no findings regarding the 2002 decision and, therefore, implicitly rejected
those findings without any explanation.

Both parties essentially request that this Court substitute its own findings for those of the
ALJ.  The Commissioner argues that the 2002 decision is not relevant to these proceedings because
of its age (four years prior to Plaintiff's application in this matter) and the fact that his prior award
of benefits was terminated due to excess resources.  In contrast, Plaintiff maintains that his
conditions have worsened over time, comparing the severity of his ailments between the two time
periods.  However, this Court cannot make factual findings on behalf of the ALJ nor re-weigh the
evidence of record as it is permitted only to review the record to determine if the ALJ's findings are
supported by substantial evidence.  *See Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir.
2001)(noting that the district court cannot substitute its own factual findings to rectify a flawed
decision by an ALJ).  As the ALJ failed to make any findings regarding the 2002 decision, his
decision is not supported by substantial evidence. Accordingly, this matter must be remanded to the
ALJ to consider and make specific findings regarding the impact of the 2002 decision on Plaintiff's
current application for benefits.

Plaintiff also argues that on remand, the ALJ must establish that there has been a medical improvement in his conditions since the prior decision "in order to find a more liberal RFC is applicable." (Docket No. 9 at 9). This Court disagrees. The continued entitlement to benefits of a claimant is subject to periodic review by the SSA. 20 C.F.R. § 416.994 ("if [a claimant] is entitled to disability benefits, [his] continued entitlement to such benefits must be reviewed periodically."). On review, the SSA must determine if there has been "medical improvement" in the claimant's condition, which is defined as:

> ... any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)

20 C.F.R. § 416.994. A seven-step "medical improvement" standard under 20 C.F.R. § 416.994 is applied to determine if the claimant is entitled to continued receipt of benefits. *Id*. However, the "medical improvement" standard is not applied when a claimant's eligibility for benefits was terminated and he later re-applies for benefits. *See Brennan v. Astrue*, 501 F.Supp.2d 1303, 1308-9 (D.Kan. 2007)(holding that the "medical improvement" standard was inapplicable to claimant whose eligibility for benefits had terminated due to incarceration). After a termination of benefits, a claimant is required to file a new application which is evaluated under the familiar five-step standard employed herein. *See* 20 C.F.R. § 416.920; *Barnhart v. Thomas*, 540 U.S. 20, 24-5 (2003)(summarizing five-step standard applicable to SSI claims). Accordingly, on remand, the ALJ must evaluate Plaintiff's claim under the five-step sequential evaluation process and, as discussed above, fully consider all of the evidence of record, including the 2002 decision.

Therefore, in light of the foregoing, the Commissioner's motion for summary judgment is denied and Plaintiff's motion for summary judgment is granted to the extent that he requests that the ALJ's opinion be vacated and the matter be remanded for further proceedings.[17]

C.   *The ALJ's Decision is Not Supported by Substantial Evidence Because the ALJ Failed to Properly Consider Plaintiff's Obesity*

The Court also directed the parties to file supplemental briefs addressing the Court of Appeals' decisions in *Diaz v. Comm. of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) and *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005).  In his supplemental brief, the Commissioner argues that these cases are distinguishable because Plaintiff did not claim obesity as a part of his disability and further contends that the ALJ properly considered obesity within the five-step sequential evaluation process set forth in his decision.  (Docket No. 15).  Plaintiff concedes in his supplemental brief that he did not plead obesity as a part of his disability but notes that "his weight may be a contributing

---

[17]

The Court notes that this is somewhat of an inequitable result given that Plaintiff twice failed to attend consultative exams scheduled for him by the Commissioner without providing any reasons for his doing so and that Plaintiff's counsel failed to submit a brief on the issue of *res judicata* within a time period set by the ALJ at the administrative hearing.  While the regulations provide that if a claimant does not have a good reason for failing to attend a consultative examination, the claimant may be found not disabled *solely on that basis*, the ALJ did not deny Plaintiff's application for benefits for this reason.  20 C.F.R. § 416.918(a); *see also Walker v. Barnhart*, 172 Fed.Appx. 423 (3d Cir. 2006)(not precedential)(affirming denial of benefits under 20 C.F.R. § 416.918 to claimant who failed to attend scheduled consultative examinations and did not provide a good reason for his failure to appear). Moreover, the ALJ did not deny benefits due to counsel's failure to submit the legal brief and the Commissioner has not argued nor is this Court aware of any authority that supports denying a claim for benefits based on the failure of counsel to submit a legal brief to an ALJ.  Instead, the ALJ considered Plaintiff's claims and issued a decision, which is reviewed by this Court under the substantial evidence standard. As this Court has concluded that the ALJ's decision is not supported by substantial evidence, it must be vacated and this matter must be remanded for further proceedings consistent with this opinion.

factor to many of his conditions" including his knee and back pain.[18] (Docket No. 14 at 4-5).

In *Diaz*, the United States Court of Appeals for the Third Circuit considered whether Social Security Ruling ("SSR") 00-3p, 65 Fed.Reg. 3109, 31040-42 (May 15, 2002), required that a matter be remanded because of the ALJ's failure to consider how a claimant's obesity, in combination with her other impairments, affected her workplace performance. *Diaz*, 577 F.3d at 503-05. The Court of Appeals found that the ALJ had acknowledged Diaz's obesity as a severe impairment but failed to provide "*any* discussion of the combined effect of Diaz's impairments" including her back pain. *Id*. at 504 (emphasis in original). As a result, the Court of Appeals concluded that the ALJ's decision was not supported by substantial evidence and remanded the case, holding that "an ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." *Id*. In so holding, the Court of Appeals distinguished its earlier decision in *Rutherford* on grounds that the ALJ in that case had not discussed nor determined "whether the claimant's obesity constituted a severe impairment." *Id*. at 505 n.4.

The Court of Appeals also recognized that "[a]lthough SSR 00-3p was superseded by SSR 02-1p, 67 Fed.Reg. 57859, 57859 (Sept. 12, 2002), SSR 02-1p did not materially amend SSR 00-3p." *Id*. The current regulations, set forth at SSR 02-1p,

---

[18]

The Court notes that Plaintiff primarily argues in his supplemental brief that *Diaz* gives further support to his argument that remand is necessary for the ALJ to make findings regarding the 2002 decision. (Docket No. 14). As the Court has already addressed this issue above, it need not address it again here.

> remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. [The regulations] also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

67 Fed.Reg. 57859, 2002 WL 31026506.

In this case, Plaintiff did not claim obesity as a severe impairment but the ALJ stated that he had considered the claimant's weight in his determination. Specifically, after making findings at Step 2, the ALJ stated that:

> I also considered the effects of [Plaintiff's] weight under Social Security Ruling 02-01p [sic], in the sequential evaluation process as it relates in combination with his other diagnoses and his overall level of functioning. Further, SSR 02-1p requires Administrative Law Judges to consider obesity in determining whether claimants have medically determinable impairments, which are severe and whether those impairments meet or equal any listing in finally determining the residual functional capacity.

(R. at 22). The Commissioner posits that this passage, coupled with the ALJ's findings regarding other evidence in the record, demonstrates that the ALJ "factored [Plaintiff's] obesity into each step in the sequential evaluation process." (Docket No. 15 at 4). This Court recognizes that "[w]hen the ALJ determines that obesity, either alone or in concert with other conditions, is not a relevant factor, there is no requirement that an ALJ repeat this determination throughout each step of the sequential analysis." *Rivera v. Comm. of Social Sec.*, 320 Fed.Appx. 128, 130 (3d Cir. 2009)(not precedential)(citing *Rutherford*, 399 F.3d at 552-53). However, in this Court's estimation, except

33

for noting the consideration of Plaintiff's weight in above quoted passage, the ALJ made no specific findings regarding whether Plaintiff's weight or its combined effect on his other impairments had any impact on the claimed disabilities at any of the steps in the evaluation process, despite recognizing that Plaintiff's weight was an issue.   As a result, remand of this issue is necessary.   On remand, the ALJ should meaningfully consider the Plaintiff's weight as required under SSR 02-01p, as well as the Court of Appeals' decisions in *Diaz* and *Rutherford*.

**VII.   CONCLUSION**

Based on the foregoing, the Commissioner's motion for summary judgment [10] is DENIED, and Plaintiff's motion for summary judgment [8] is GRANTED IN PART AND DENIED IN PART. Plaintiff's motion is denied to the extent that it seeks an award of benefits and it is granted to the extent that it seeks a vacation of the administrative decision currently under review and a remand for further proceedings.   Accordingly, the administrative decision is VACATED and this matter is REMANDED for further proceedings consistent with this opinion.   An appropriate Order follows.

> *s/Nora Barry Fischer*
> Nora Barry Fischer
> United States District Judge

Dated: October 16, 2009

cc/ecf:  All counsel of record

34